USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 31, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

THANI AHMED, ALI YAHYA, BASHAR YAHYA, SUAAD YAHYA, ABU MOBAREZ, HASNA MOBAREZ, TAREQ ALJAHMI, EMAN ALGAHMI, YAHYA ALJAHMI, JABRA NAJI, BASHEER AL-KHADHER, JULIE ALI, HUSSEIN MOHAMEN, SALEH MOHAMED, MOMENAH ALSADI, AIDAH MOFLEHI, AMIRA AL-GAADI, WASSIM AL-GAADI, ESHRAK AL-GAADI, INTISAR MOFLEHI, MANSOUR AL-GAADI, ANSAM MOHAMMED, ABDULQAWI MOHAMMED, KHALED MOHAMMED, and ABDULCAFI MOHAMMED,

                                        Plaintiffs,

                  -v.-

LEE FRANCIS CISSNA, in his official capacity as Director, United States Citizenship and Immigration Services, LAURIE O'BRYON, in her official capacity as Rome Office Field Director, United States Citizenship and Immigration Services, JOSEPH LANGOLIS, in his official capacity as Europe, Middle East, and Africa District Director, United States Citizenship and Immigration Services, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, UNITED STATES EMBASSY IN DJIBOUTI, UNITED STATES EMBASSY IN MALAYSIA, and UNITED STATES DEPARTMENT OF STATE,

                                        Defendants.

------------------------------------------

17 Civ. 4608 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiffs mount various statutory and constitutional challenges to the filing and adjudication procedures for Form I-130 petitions, which permit United States citizens and lawful permanent residents to petition on behalf of

immediate relatives wishing to immigrate to the United States.[1]  They seek to file petitions on behalf of family members who are presently residing in Djibouti, but who fled Yemen to escape that country's civil war.  Each beneficiary is a spouse, parent, or child of a United States citizen.

Plaintiffs allege that they attempted to file their petitions at the United States Embassy in Djibouti, but were denied permission.  They contend that the consular officers' failure to accept their petitions contravenes existing statutes and agency regulations.  What is more, Plaintiffs contend that the United States Citizenship and Immigration Services ("USCIS") has impermissibly failed to send personnel to the Embassy in Djibouti to adjudicate I-130 petitions.  In consequence, Plaintiffs bring claims under the Declaratory Judgment Act, 28 U.S.C. § 2201; the Mandamus Act, 28 U.S.C. § 1361; the Administrative Procedure Act ("APA"), codified in part at 5 U.S.C. ch. 5; and the Fifth Amendment to the United States Constitution.  They request, *inter alia*, that this Court (i) require USCIS to send personnel to the United States Embassies in Djibouti and Malaysia to adjudicate petitions filed on behalf of Yemeni beneficiaries, and (ii) mandate that Plaintiffs be permitted to file their petitions with the United States Embassy in Djibouti, rather than being required to file their petitions by mail to a domestic "lockbox."

Pending before the Court is Defendants' motion to dismiss Plaintiffs' First Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal

---

[1]  Plaintiffs are at times referred to in the pleadings and motion papers as "petitioners."

Rules of Civil Procedure.  In resolving this motion, the Court in no way minimizes Plaintiffs' concerns about the I-130 petition process and the medical and emotional needs of Plaintiffs and their family members.  However, for the reasons that follow, Plaintiffs' claims are beset with jurisdictional and pleading defects to which the Court cannot turn a blind eye.  Accordingly, Defendants' motion to dismiss is granted in full.

## BACKGROUND

### A.    Factual Background[2]

#### 1.    The Parties

Plaintiffs are seven families, each with one or more United States citizens seeking to file I-130 petitions on behalf of Yemeni family members — spouses, parents, or children — residing in Djibouti.  They are: (i) Thani Ahmed, a United States citizen residing in Djibouti who seeks to file on behalf of her children, Ali Yahya, Bashar Yahya, and Suaad Yahya; (ii) Abu Mobarez, a United States citizen residing in New York who seeks to file on behalf of his son, Hasna Mobarez; (iii) Tareq Aljahmi, a United States citizen seeking to file

---

[2]    The facts in this section are drawn from the First Amended Complaint ("FAC" (Dkt. #35)), filed on October 25, 2017.  In adjudicating the pending motion to dismiss, the Court accepts as true the well-pleaded allegations in the FAC.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam).  The Court also draws, where relevant, from existing agency policies and regulations.  For ease of reference, the Court refers to Defendants' opening brief as "Def. Br." (Dkt. #50); to Plaintiffs' opposition brief as "Pl. Opp." (Dkt. #53); to Defendants' reply brief as "Def. Reply" (Dkt. #57); to the Declaration of Maura Nicholson in support of Defendants' motion to dismiss, dated February 9, 2018, as "Nicholson Decl." (Dkt. #49); to the Declaration of Julie Goldberg in opposition to Defendants' motion to dismiss, dated February 27, 2018, as "Goldberg Decl." (Dkt. #53-1); to the Declaration of Christine Sung in further support of Defendants' motion to dismiss, dated March 8, 2018, as "Sung Decl." (Dkt. #58); and to the Declaration of Laurie O'Bryon in further support of Defendants' motion to dismiss, dated February 8, 2018, as "O'Bryon Decl." (Dkt. #59).

on behalf of his wife, Eman AlGahmi, and child, Yahya Aljahmi; (iv) Jabra Naji, a United States citizen residing in Djibouti who seeks to file on behalf of her husband, Basheer Al-Khadher, and daughter, Julie Ali; (v) Hussein Mohamed and Saleh Mohamed, United States citizens residing in New York who seek to file on behalf of their mother and wife, respectively, Momenah Alsadi; (vi) Aidah Moflehi, a United States citizen seeking to file on behalf of her children, Amira Al-Gaadi, Wassim Al-Gaadi, and Eshrak Al-Gaadi; and (vii) Intisar Moflehi, a United States citizen seeking to file on behalf of her husband, Mansour Al-Gaadi, and her children, Ansam Mohammed, Abdulqawi Mohammed, Khaled Mohammed, and Abdulcafi Mohammed.  (FAC ¶¶ 6-12).

Defendants are (i) USCIS, an agency within the United States Department of Homeland Security that administers immigration benefits and services and, as relevant here, adjudicates I-130 petitions for alien relatives; (ii) Lee Francis Cissna, Director of USCIS; (iii) Laurie O'Bryon, Director of the USCIS Rome Field Office, an office that has the discretionary authority to permit Plaintiffs to file I-130 petitions directly with the United States Embassy in Djibouti; (iv) Joseph Langolis, Director of the USCIS District for Europe, the Middle East, and Africa; (v) the United States Embassy in Djibouti; (vi) the United States Embassy in Malaysia; and (vii) the United States Department of State.  (FAC ¶¶ 13-19).

## 2. The I-130 Filing Process

### a. The Default Procedure

The Immigration and Nationality Act ("INA"), codified at 8 U.S.C. ch. 12, sets forth a process by which an immediate relative of a United States citizen may immigrate to the United States. *See* 8 U.S.C. §§ 1153(a), 1154(a)(1)(A)(i); 8 C.F.R. § 204.1(a)(1). Though the INA calls for I-130 petitions to be filed with the Attorney General, *see* 8 U.S.C. § 1154(a)(1)(A)(i), Congress transferred the authority to adjudicate I-130 petitions to the USCIS when it passed the Homeland Security Act of 2002, *see* Pub. L. No. 107-296, § 451(b), 116 Stat. 2135, 2196 (2002). An alien seeking to obtain an immigrant visa on the basis of a familial relationship must cause the relevant family member to file an I-130 petition on her behalf. *See* 8 C.F.R. §§ 1153(a), 1154(a)(1)(A)(i); 8 C.F.R. § 204.1(a).

The default procedure for filing an I-130 petition, which applies irrespective of whether the petitioner resides in the United States or abroad, is to mail the petition to a domestic "lockbox," either in Phoenix or Chicago. *See* https://www.uscis.gov/i-130-addresses (last visited Aug. 30, 2018) (USCIS website specifying filing locations, by state or country of residence, for I-130 petitions). Once the petition has been filed, USCIS assesses whether "the facts stated in the petition are true and [ ] the alien in behalf of whom the petition is made is an immediate relative[.]" *See* 8 U.S.C. § 1154(b). If the familial relationship is verified, "the INS will 'approve' the petition[.]" *Drax* v. *Reno*, 338 F.3d 98, 114 (2d Cir. 2003). "[T]he approval of Form I-130 results in the

beneficiary of the petition being classified as an immediate relative for purposes of issuing a visa for admission to the United States; it does not grant a visa or permanent resident status." *Bolvito* v. *Mukasey*, 527 F.3d 428, 430 n.4 (5th Cir. 2008). Instead, the alien beneficiary, once approved by USCIS, must still apply for a visa with the State Department.

### b. Special Procedures for Petitioners Residing Abroad

For a United States citizen living abroad who wishes to file an I-130 petition, the filing method hinges on whether USCIS maintains a field office in the petitioner's country of residence. *See* 9 Foreign Affairs Manual ("FAM") 504.2-3. If a USCIS field office exists, petitioners may file their I-130 petitions directly with the USCIS public counter at the local embassy or consulate. *See id.* 504.2-3(B). If not, petitioners must typically file the petitions by mail to the Chicago lockbox. In some instances, where petitioners demonstrate exceptional circumstances, they may be permitted to file their petitions directly with their local embassy or consulate, even where there is no USCIS public counter. *See id.* 504.2-4.

In the face of exceptional circumstances, USCIS may, in its discretion after receiving requests from consular officers or other State Department officials, permit petitioners to file I-130 petitions at the local embassies or consulates. The Department of State's Foreign Affairs Manual states, in relevant part:

> If a consular section without a USCIS public counter presence encounters an exceptional circumstance case, then the Consular Chief, or another designated officer, must receive authorization from the regional USCIS

6

> Field Office Director (or his/her designee) prior to accepting and adjudicating the filing. Post should contact the appropriate USCIS field office by phone or e-mail, providing the specifics of the reason for the exception request. USCIS will have discretion to determine which cases can be processed using the exceptional circumstances procedures and which petitioners should be directed to file by mail with the USCIS lockbox in the United States.

9 FAM 504.2-4(B)(1)(b)(2). Examples of exceptional circumstances include: threats to personal safety, where the "petitioner or beneficiary is facing an imminent threat to personal safety"; medical emergencies requiring "immediate travel"; and "[c]ases close to aging out[, where the] beneficiary is within a few months of aging out of eligibility." *Id.* 504.2-4(B)(1)(b)(3).

USCIS considers various factors, including cost, in determining whether to permit consular officers to accept petitions filed directly at local embassies or consulates. In a Policy Memorandum dated May 14, 2012, USCIS explained that, "it is more cost-effective for USCIS to adjudicate all I-130s with certain limited exceptions" than to permit "consular officers [to] process[ ] I-130 [petitions] filed overseas where USCIS does not have a presence." INS Policy Memorandum, PM-602-0043. Accordingly, USCIS generally requires that a petitioner residing outside the United States file the I-130 petition by mailing it to a domestic lockbox. *Id.* The memo further explains that, "[i]f a consular officer in an embassy or consulate where USCIS is not present encounters an individual case that the officer believes requires immediate processing due to exceptional circumstances, the consular officer should contact the USCIS Field Operating Director (FOD) with jurisdiction over that location to determine

whether [the consular officer] may accept and adjudicate the case." *Id.*
Without approval from the USCIS Field Operating Director, consular officers
have no authority to accept or adjudicate I-130 petitions. *Id.*

### c. Procedures Specific to I-130 Petitions Filed on Behalf of Yemeni Beneficiaries

Yemen does not have an established system of recording vital statistics,
and most Yemenis do not contemporaneously register births, marriages,
divorces, and deaths. *See* Department of State, Visa Reciprocity Schedule for
Yemen, https://travel.state.gov/content/travel/en/us-visas/Visa-Reciprocity-
and-Civil-Documents-by-Country/Yemen.html (last visited Aug. 30, 2018). For
that reason, USCIS generally does not consider civil documents issued in
Yemen to be sufficient where a petitioner seeks to establish a qualifying
relationship for I-130 purposes. *See* USCIS Policy Memorandum, PM-602-
0064. Where a petitioner is able to produce credible DNA evidence, USCIS may
approve the petition without an in-person interview; by contrast, "a case
without DNA evidence cannot be approved without the petitioner first being
interviewed." *Id.*

### 3. Plaintiffs' Efforts to File I-130 Petitions

In 2015, the United States Embassy in Sana'a, Yemen, was permanently
closed due to security concerns relating to the Yemeni civil war. (FAC ¶ 23).
The Embassy in Sana'a housed a USCIS public counter, where Americans
could file I-130 petitions on behalf of Yemeni beneficiaries; the Embassy in
Sana'a also had a USCIS adjudicator onsite. (*Id.* at ¶¶ 20-21). Following the
Embassy's closure, the Department of State transferred pending visa

applications to other embassies, including the Embassies in Djibouti and Malaysia. (*Id.* at ¶ 24). USCIS does not have a public counter presence where individuals could file their petitions in Djibouti, nor any personnel stationed at the Embassy in Djibouti. (*Id.* at ¶ 26).

Plaintiffs claim that they attempted to file their I-130 petitions at the Embassy in Djibouti, but that the consular officers at the Embassy refused to accept the petitions. (FAC ¶¶ 29-35). They allege that Defendants "deliberately caused … unnecessary and excessive delays and expenses by refusing to accept direct filed I-130 Petitions at the [ ] Embassy in Djibouti." (*Id.* at ¶ 36). Because of USCIS's lack of presence at the Embassy in Djibouti, and because consular officers in Djibouti have refused to accept Plaintiffs' petitions, Plaintiffs have been unable to file at the Embassy. (*Id.* at ¶ 27). Plaintiffs allege that the lack of onsite USCIS adjudicators makes it impossible for petitioners to have interviews conducted in Djibouti, which in turn "has caused families to be separated from each other[,]" and "[i]n many cases" has prevented "elderly individuals, minor children, and several ill individuals from entering the [United States] in order to seek much needed medical attention" and has resulted in the "death[s] of children and elderly applicants." (*Id.* at ¶ 28).

If Plaintiffs are not permitted to file at the Embassy in Djibouti, their alternative would be to mail their petitions to the Chicago lockbox. But "USCIS maintains a policy of interviewing the petitioners of I-130 petitions for Yemen[i] nationals." (FAC ¶ 29). As a result, if Plaintiffs were to file their petitions via

the Chicago lockbox, they would be required to travel to the United States for in-person interviews, which they are presently unable to do.  (*See, e.g.*, *id.*).

Plaintiffs allege that they should not be required to mail their petitions to the Chicago lockbox, in light of "exceptional circumstances" that, under existing regulations, allegedly give them the right to file their petitions at the Embassy in Djibouti.  (FAC ¶¶ 29-35).  These exceptional circumstances include threats to personal safety, medical emergencies, and temporal proximity to aging out of eligibility.  *See* https://www.uscis.gov/archive/archive-news/uscis-centralizes-filing-form-i-130-0 (last visited Aug. 30, 2018).  Plaintiff Thani Ahmed alleges, for example, that she is a "de facto single mother" who "is unable to leave her minor children to travel to the United States to file an I-130 [p]etition" or "to attend an interview at a USCIS field office in the United States[.]"  (*Id.* at ¶ 29).  Plaintiff Abu Mobarez's wife "is currently hospitalized and in critical condition," in light of which Mobarez "qualifies to file a direct I-130 Petition at the [ ] Embassy in Djibouti for his 13[-]year[-]old daughter in Djibouti so that she may see her mother before her mother passes away."  (*Id.* at ¶ 30).  Plaintiffs Hussein Mohamed and Saleh Mohamed seek to file a petition on behalf of Momenah Alsadi, who is "an elderly woman in poor health[.]"  (*Id.* at ¶ 33).  Plaintiff Intisar Moflehi is a United States citizen who seeks to file I-130 Petitions on

behalf of her minor children, who may soon "ag[e] out to qualify as a child of an Immediate Relative." (*Id.* at ¶ 35).[3]

Defendants have "failed to accept Plaintiffs' direct I-130 Petitions even though Plaintiffs meet the requirements for filing I-130 Petitions at the [ ] Embassy in Djibouti," and "have failed to provide a USCIS onsite adjudicator at the [ ] Embassy in Djibouti despite the fact that the volume of directly filed I-130 Petitions necessitates USCIS to staff the [ ] Embassy with an onsite adjudicator." (FAC ¶ 37). Though Plaintiffs have not mailed their petitions to the Chicago lockbox, they claim to have "exhausted all administrative options for relief." (*Id.*).

## B. Procedural Background

Plaintiffs filed a Petition for Writ of Mandamus on June 19, 2017. (Dkt. #1). On October 25, 2017, Plaintiffs filed a First Amended Complaint for Injunctive Relief and Petition for Writ of Mandamus. (Dkt. #35). On December 6, 2017, the Court held a pre-motion conference regarding Defendants' contemplated motion to dismiss, at the conclusion of which the Court set a briefing schedule. (*See* Dkt. #44). Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6) on February 9, 2018 (Dkt. #48); Plaintiffs filed their opposition brief on February 28, 2018 (Dkt. #53); and Defendants filed their reply on March 9, 2018 (Dkt. #57).

---

[3]    Plaintiffs allege that Tareq Aljahmi's Jabra Naji's, and Aidah Moflehi's petitions also present exceptional circumstances that, in Plaintiffs' estimation, give them the right to file their petitions directly with the Embassy in Djibouti. (*See* FAC ¶¶ 31-32, 34).

**DISCUSSION**

**A. Applicable Law**

> **1. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)**

"It is a fundamental precept that federal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C.* v. *Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation marks omitted). In that regard, "a district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it." *Aurecchione* v. *Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (internal quotation marks omitted); *accord Sokolowski* v. *Metro. Transp. Auth.*, 723 F.3d 187, 190 (2d Cir. 2013).

A "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova* v. *U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). In resolving a Rule 12(b)(1) motion to dismiss, "[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff, … but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal citation and quotation marks omitted). Where subject matter jurisdiction is contested, a district court is permitted to consider evidence outside the pleadings, such as

12

affidavits and exhibits. *See Zappia Middle E. Constr. Co.* v. *Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) ("On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing."); *accord Tandon* v. *Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." (citation omitted)).

Several concepts of justiciability are implicated by Plaintiffs' arguments, including standing, ripeness, and the political question doctrine. These concepts are addressed in turn in the remainder of this section.

### a.  Article III Standing: The Injury-In-Fact Requirement

Article III of the Constitution limits federal courts' jurisdiction to "cases" and "controversies." U.S. Const., Art. III, § 2. "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List* v. *Driehaus*, — U.S. —, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The Supreme Court has "established that the 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc.* v. *Robins*, — U.S. —, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan*, 504 U.S. at 560). "The plaintiff must have [i] suffered an injury

in fact, [ii] that is fairly traceable to the challenged conduct of the defendant, and [iii] that is likely to be redressed by a favorable judicial decision." *Id.*

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (internal quotations marks and citation omitted). "'[T]hreatened injury must be *certainly impending* to constitute injury in fact,' and … '[a]llegations of *possible* future injury' are not sufficient." *Clapper* v. *Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore* v. *Ark.*, 495 U.S. 149, 158 (1990)).

### b.    The Requirement of Ripeness

"To be justiciable, a cause of action must be ripe — it must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc.* v. *Walsh,* 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd.* v. *Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993)). "Ripeness 'is peculiarly a question of timing.'" *Id.* (quoting *Thomas* v. *Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). Claims are not ripe if they depend upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas*, 473 U.S. at 580-81. The ripeness doctrine's principal purpose is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 148 (1967).

"There are two forms of ripeness: constitutional and prudential." *Vullo* v. *Office of Comptroller of the Currency*, No. 17 Civ. 3574 (NRB), 2017 WL

6512245, at *8 (S.D.N.Y. Dec. 12, 2017) (citing *Simmonds* v. *INS*, 326 F.3d 351, 356-57 (2d Cir. 2003)).  The former is "a specific application of the actual injury aspect of Article III standing."  *Walsh*, 714 F.3d at 688.  It "prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it."  *Simmonds*, 326 F.3d at 357.  Prudential ripeness, by contrast, is a tool a court may employ, in its discretion, when "the case will be *better* decided later and [ ] the parties will not have constitutional rights undermined by the delay."  *Id.*  "Prudential ripeness [is employed by courts] to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial."  *Id.*

### c.    The Political Question Doctrine

Though "the Judiciary [generally] has a responsibility to decide cases properly before it," there is "a narrow exception to that rule, known as the 'political question' doctrine."  *Zivotofsky ex rel. Zivotofsky* v. *Clinton*, 566 U.S. 189, 194-95 (2012).  This doctrine precludes courts from deciding controversies where "there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it[.]'"  *Nixon* v. *U.S.*, 506 U.S. 224, 228 (1993) (quoting *Baker* v. *Carr*, 369 U.S. 186, 217 (1962)).  The doctrine also "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally

committed for resolution to the halls of Congress or the confines of the

Executive Branch." *Japan Whaling Ass'n* v. *Am. Cetacean Soc'y*, 478 U.S. 221,

230 (1986). The Supreme Court has identified six independent tests for the

existence of a non-justiciable political question:

> [i] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [ii] a lack of judicially discoverable and manageable standards for resolving it; or [iii] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [iv] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or [v] an unusual need for unquestioning adherence to a political decision already made; or [vi] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Vieth* v. *Jubelirer*, 541 U.S. 267, 277-78 (2004) (quoting *Carr*, 369 U.S. at 217).

Unlike standing, which focuses on the "nature of the *party* seeking a

judgment," this doctrine "focuses on the nature of the *issue* presented to the

court[.]" *DaCosta* v. *Laird*, 471 F.2d 1146, 1152 n.10 (2d Cir. 1973). Though

the political question doctrine and standing doctrine have different points of

focus, they both "originate in Article III's 'case' or 'controversy' language[.]"

*DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 353 (2006). Each doctrine "poses

a distinct and separate limitation, ... so that either the absence of standing or

the presence of a political question suffices to prevent the power of the federal

judiciary from being invoked by the complaining party." *Schlesinger* v.

*Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974) (internal citation

omitted).

## 2. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When a court considers a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), it must "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). A plaintiff will survive a motion to dismiss if she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiffs'] claims across the line from conceivable to plausible." (internal quotation marks and citation omitted)).

A court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions[.]" *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation omitted); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks, brackets, and citation omitted)).

## B.   Analysis

The Court begins with the threshold question of whether Plaintiffs'
claims are justiciable.  Because "Article III standing is always an antecedent
question," the Court must address Defendants' Rule 12(b)(1) arguments before
turning, as necessary, to Defendants' Rule 12(b)(6) arguments.  *See Wong* v.
*CKX, Inc.*, 890 F. Supp. 2d 411, 414-15 (S.D.N.Y. 2012) ("When presented with
a motion under Rule 12(b)(1) to dismiss ... and Rule 12(b)(6) to dismiss ..., the
Court must first analyze the Rule 12(b)(1) motion to determine whether the
Court has subject matter jurisdiction necessary to consider the merits of the
action.").  Here, the Court will first assess whether Plaintiffs have met the
injury-in-fact requirement for Article III standing.  It will then evaluate the
ripeness of Plaintiffs' claims, and the impact, if any, of the political question
doctrine.

Because the Court finds that only some of Plaintiffs' claims — in
particular, those relating to the consular officers' refusal to accept Plaintiffs'
direct-filed I-130 petitions at the Embassy in Djibouti — survive the Rule
12(b)(1) motion, the Court limits its consideration of the merits under Rule
12(b)(6) to those claims.[4]

---

[4]    The Court has considered — and is unpersuaded by — Defendants' argument that "[a]
district court action for judicial review of an administrative decision concerning a
petition for an immigrant visa may be brought only by the petitioner, not by the
beneficiary of the petition." (Def. Br. 10).  Defendants devote but two sentences in their
briefs to this argument, and the cases they cite are factually and legally distinguishable.
Those cases, unlike the one at bar, involve appeals of visa denials or petition
revocations, and the courts based their holdings on a regulation that governs appeals of
petition denials, inapplicable here.  *See Blacher* v. *Ridge*, 436 F. Supp. 2d 602, 606 n.3
(S.D.N.Y. 2006) (holding that plaintiff seeking to appeal a visa denial was not a proper
party to the action because, under 8 C.F.R. § 103.3(a)(1)(iii)(B), the affected party is the

1. **Defendants' Rule 12(b)(1) Motion Is Granted in Part and Denied in Part**

   a. **Plaintiffs Have Satisfied the Injury-in-Fact Prong of the Article III Standing Inquiry as to Certain Claims**

In evaluating standing, "the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha* v. *EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003); *see also Parker* v. *Dist. of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd by Dist. of Columbia* v. *Heller*, 554 U.S. 570 (2008). "While standing and merits questions frequently overlap, standing is fundamentally about the propriety of the individual litigating a claim irrespective of its legal merits[.]" *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 220 (S.D.N.Y. 2016) (citation omitted).

Plaintiffs identify two primary sources of injuries-in-fact. The first is the consular officers' decisions not to accept Plaintiffs' I-130 petitions, which Plaintiffs attempted to file at the Embassy in Djibouti; the second, USCIS's failure to send an adjudicator to Djibouti, which, in Plaintiffs' estimation, all but guarantees that Plaintiffs would eventually be required to travel to the United States for in-person interviews, which they are unable to do. (FAC ¶¶ 29, 56, 58, 63). Plaintiffs allege that, together, these actions "have caused Plaintiffs severe physical, emotional, and financial hardship." (*Id.* at ¶ 58).

---

petitioner, not the beneficiary); *Ibraimi* v. *Chertoff*, No. 07 Civ. 3644 (DMC), 2008 WL 3821678, at *3 (D.N.J. Aug. 12, 2008) (same for petition revocation); *Morris* v. *Gonzales*, No. 06 Civ. 4383 (BWK), 2007 WL 2740438, at *6 (E.D. Pa. 2007) (same for visa revocation).

Plaintiffs allege in particular that Defendants have "infringe[d] upon Plaintiffs['] … liberty interests to make personal choices with regard to family matters free from unjustifiable government interference[.]" (*Id.* at ¶ 59). Plaintiffs "are in dire need of schooling, medical attention, housing[,] and reunification with their family in the United States." (Pl. Opp. 17). They argue that their injuries are "concrete, ongoing, and directly traceable to Defendants" (*id.*), and are caused "by the willful failure of the Defendants[ ] to provide a USCIS adjudicator to adjudicate the emergency direct I-130 Petitions and forward the case[s] to the Department of State for Immigrant Visa processing, as is their duty" (FAC ¶ 61).

Defendants, for their part, assert that Plaintiffs have failed to allege an injury-in-fact because they "need not leave Djibouti in order to file an I-130 Petition that will be adjudicated." (Def. Reply 8). Defendants further contend that, "[b]ecause petitioners can submit their petitions via the USCIS Lockbox …, to the extent that the purported harm is that a petitioner may be required to travel to the United States for an in-person interview, until USCIS makes such a determination in a particular case, there is no imminent or actual harm as to any plaintiff." (*Id.*). In Defendants' estimation, "the Chicago Lockbox facility is an adequate alternative remedy that the plaintiffs have failed to even attempt to pursue, and thus their claimed injury is purely fictive and fails to satisfy the minimum constitutional requirements for standing." (Def. Br. 10).

If Plaintiffs' only alleged injuries were based on their inability to travel to the United States for in-person interviews that were necessitated by USCIS's failure to send an adjudicator to Djibouti and the policy requiring interviews in the absence of DNA evidence for Yemeni beneficiaries, the Court might agree with Defendants that Plaintiffs' injuries are too speculative to confer standing. After all, "[i]n petitions involving a biological parent-child relationship, a petitioner may not be required to attend an in-person interview if the petitioner voluntarily submits the results of a credible DNA test performed by an accredited laboratory which support the claimed relationship." (Sung Decl. ¶ 5). In addition, USCIS "has the discretion, on a case-by-case basis, to conduct the petitioner's in-person interview at a USCIS international field office … [where] the petitioner demonstrates exceptional circumstances … which prevent him or her from traveling to the United States[.]" (Nicholson Decl. ¶ 12). Contrary to Plaintiffs' allegations, it is not certain that Plaintiffs would have to travel to the United States for in-person interviews, even if they were to file their petitions via the Chicago lockbox.

As it happens, however, Plaintiffs' alleged injuries do not rest exclusively on their inability to travel to the United States for in-person interviews. Instead, Plaintiffs also allege that current USCIS and State Department regulations give them — and other petitioners facing exceptional circumstances — the right to file their petitions directly at the Embassy in Djibouti. (*See, e.g.*, FAC ¶ 69). They further allege that they attempted to file their petitions at the Embassy, and that, contrary to existing policy, consular

21

officers have refused to accept those petitions. (*See id.* at ¶¶ 29-35). Plaintiffs argue that, in rejecting their petitions, Defendants "unlawfully infringe[d] upon Plaintiffs['] … interest in having their famil[ies'] I-130 Petitions accepted and adjudicated in a manner consistent with their constitutionally protected procedural due process interests[.]" (*Id.* at ¶ 60).

Plaintiffs' alleged injury — the disregard of their right to file directly at the Embassy — is concrete and particularized, not speculative or hypothetical. Taking Plaintiffs' allegations as true, as the Court must do at this stage of the litigation, the Court cannot overlook the fact that consular officers in Djibouti have already refused to accept Plaintiffs' I-130 petitions, a refusal that in Plaintiffs' estimation has prevented them from being reunited with family members and from seeking much-needed medical attention, schooling, and housing. Those injuries have affected Plaintiffs "in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1, and "actually exist," *Spokeo*, 136 S. Ct. at 1548. The Court is hard-pressed to imagine injuries that could be considered to be more concrete, more personal, or more particularized than those suffered when families are kept apart or when individuals in need of urgent medical care are prevented from receiving it.

Defendants would have this Court transform the injury-in-fact inquiry into an exhaustion-of-remedies inquiry by requiring that Plaintiffs file their I-130 petitions via the Chicago lockbox before alleging injuries-in-fact. Yet Defendants do not cite any cases suggesting that exhaustion is necessary to establish injuries-in-fact for purposes of Article III standing. In fact,

exhaustion is a matter of statutory, not Article III, standing. *See Wong* v. *Daines*, 582 F. Supp. 2d 475, 479 (S.D.N.Y. 2008). The inquiries are distinct. Defendants have failed to explain why Plaintiffs must file their petitions via the Chicago lockbox before claiming to have been injured by consular officers' refusal to accept their direct-filed petitions.

Defendants' claim that Plaintiffs have not been "adversely affected or aggrieved by agency action within the meaning of the relevant statute" is unpersuasive. (Def. Br. 11 (quoting 5 U.S.C. § 702)). If Plaintiffs are correct that existing regulations required consular officers to accept Plaintiffs' I-130 petitions, then the refusal to accept those petitions at the Embassy in Djibouti constitutes an "agency action" that "adversely affected" the Plaintiffs. 5 U.S.C. § 702. Defendants do not advance a cogent theory as to why the consular officers' refusal to accept Plaintiffs' petitions does not constitute an agency action, nor do they explain why the alleged injuries do not suffice to establish Article III standing.[5] Plaintiffs here seek to file their I-130 petitions in order, *inter alia*, to be reunited with family members and to receive much-needed medical attention and schooling. They have alleged concrete, particularized grievances stemming from Defendants' failure to accept their direct-filed I-130 petitions.

---

[5] Defendants reference a "zone-of-interest" test in arguing that Plaintiffs lack prudential standing. The Supreme Court has held that, in cases involving statutory claims, the zone-of-interest test does not relate to prudential standing but instead goes to the merits of the claims. *See Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, — U.S. —, 134 S. Ct. 1377, 1387-88 (2014). The Court therefore declines to engage in a zone-of-interest analysis in connection with the present inquiry into Plaintiffs' Article III standing.

For these reasons, the Court finds that Plaintiffs have sufficiently alleged injuries-in-fact for purposes of Article III standing, at least as to certain of their claims.

### b. Plaintiffs' Claims Relating to the Location of USCIS Adjudicators Are Unripe

The Court next assesses whether Plaintiffs' claims, including those that fail to allege a cognizable injury-in-fact,[6] are ripe. It begins by noting that, although the doctrine of ripeness has both constitutional and prudential strands, Defendants focus exclusively on constitutional ripeness. In their view, Plaintiffs' claims are unripe because Plaintiffs "have not attempted to file their I-130 petitions through the Chicago Lockbox … [and] have thus failed to demonstrate an adverse agency action or harm." (Def. Br. 12). "Because the [P]laintiffs' claims do not challenge a particular 'administrative decision [that] has been formalized,' … they are not ripe for review and should be dismissed." (*Id.* at 13 (quoting *Abbott Labs.*, 387 U.S. at 148)).

The Court agrees with Defendants' ripeness arguments as they pertain to Plaintiffs' claims relating to USCIS's failures (i) to maintain a public counter presence at the Embassy in Djibouti and (ii) to send adjudicators to Djibouti. The Court previously explained that the alleged harm stemming from USCIS's lack of presence in Djibouti rests on the inevitability *vel non* of an in-person interview in the United States. Specifically, Plaintiffs claim that if they were to file their petitions via the USCIS lockbox in Chicago, they would be required to

---

[6] The Court here errs on the side of inclusion, preferring to identify multiple jurisdictional defects if such defects exist.

attend in-person interviews in the United States, which they would be unable to do.  (*See, e.g.*, FAC ¶ 29 ("Even if Plaintiff … filed I-130 Petitions for her children by mailing [them] to USCIS'[s] Chicago lockbox, she would be required to attend an interview at a USCIS field office in the United States[.]")).

But as the Court has already explained, Plaintiffs' claim that they will be required to travel to the United States for in-person interviews is speculative.  *See supra* at Section (B)(1)(a).  Indeed, in petitions involving biological child-parent relationships, petitioners may be exempted from the in-person interview requirement if they submit the results of DNA tests performed by accredited laboratories.  (*See* Nicholson Decl. ¶ 11).  And, for all other relationships, or where DNA evidence is either unavailable or unreliable, USCIS "has the discretion, on a case-by-case basis, to conduct the petitioner's in-person interview at a USCIS international field office in cases where the petitioner is residing abroad and has either filed at the USCIS domestic lockbox or attempted to file abroad but [the Department of State] has exercised discretion not to accept the filing."  (*Id.* at ¶ 12).

The papers filed in connection with the pending motion suggest that USCIS has, in fact, granted the sole request it received to permit Plaintiffs to file locally in Djibouti.  As Laurie O'Bryon, USCIS's Rome Field Office Director, explains: "[USCIS was] unable to find any record for any of the named plaintiffs except Plaintiff Jabra Naji[.]  A request for authorization to accept a locally-filed [ ] I-130 petition from Plaintiff Naji [ ] was received on September 5, 2017.  I approved that request on the same day."  (O'Bryon Decl. ¶ 5).  This suggests

that Plaintiff Jabra Naji likely will not need to travel to the United States for a possible interview with USCIS in connection with her I-130 petition. No other request for authorization to file locally has been received by the USCIS Field Office in Rome. (*Id.*). To the extent that such requests are transmitted on behalf of other Plaintiffs, those Plaintiffs may similarly be permitted to file locally, and potentially exempted from traveling to the United States for any interviews in connection with their I-130 petitions.

At this time, Plaintiffs' claims relating to their alleged inability to travel for in-person interviews are speculative and therefore unripe. Those claims will ripen only once Plaintiffs have filed their petitions, interviews have been scheduled requiring travel that Plaintiffs are unable to undertake, and Plaintiffs have been denied accommodations despite having demonstrated exceptional circumstances that prevent them from traveling.

By contrast, the claims relating to the consular officers' refusal to accept Plaintiffs' direct-filed I-130 petitions — allegedly in contravention of existing statutes and regulations — are ripe. Those injuries were sustained the moment the consular officers rejected Plaintiffs' applications. The injuries are not speculative, nor would the claims related thereto "entangl[e] [the Court] in abstract disagreements over administrative policies[.]" *Abbott Labs.*, 387 U.S. at 148. And the Court fails to see how the passage of time might "enhance the accuracy of the[ Court's] decisions" or make the questions at issue "easier or less controversial." *Simmonds*, 326 F.3d at 357. Those questions, which

revole around consular officers' duties under existing regulations, are ripe for adjudication.

### c. The Political Question Doctrine Prevents This Court From Adjudicating Plaintiffs' Claims Relating to the Location of USCIS Personnel

The Court concludes its justiciability analysis by considering the political question doctrine — which, it ultimately finds, precludes this Court from adjudicating Plaintiffs' claims regarding USCIS staffing decisions.

Plaintiffs contend that "USCIS staffs onsite adjudicators on an 'as need basis,' and Defendants['] refusal to place an onsite adjudicator at the [ ] Embassy in Djibouti and/or Malaysia is arbitrary and capricious." (Pl. Opp. 5 (citing FAC ¶ 87)). They further claim that "Defendant[s'] refusal to [send adjudicators to] the [United States] Embassies with the highest number of immigrant petitions for Yemen[i] citizens discriminates [against] beneficiaries based on nationality." (FAC ¶ 96). By way of remedy, Plaintiffs request that this Court require "Defendants [to] station a USCIS onsite adjudicator trained in handling direct-filed I-130 petitions on behalf of Yemen[i] applications at the [ ] Embass[ies] in Djibouti and Malaysia." (Pl. Opp. 6; *see also* FAC ¶ D (calling for the Court to "[m]andate that [ ] USCIS send a USCIS adjudicator to be staffed and trained on Yemeni direct I-130 filings at the [ ] Embassy in Djibouti and the [ ] Embassy in Malaysia so as to accept and adjudicate Plaintiffs' direct I-130 Petitions[.]")).[7]

---

[7]     In her Declaration in opposition to Defendants' motion, Plaintiffs' counsel appears also to challenge the legality of the Trump Administration's failure to extend blanket authority for consular officers to accept direct-filed I-130 petitions. (*See* Goldberg Decl.

Requests for injunctive relief relating to USCIS staffing decisions are non-justiciable, as there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department[.]" *Carr*, 369 U.S. at 217. The Supreme Court has explained that "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews* v. *Diaz*, 426 U.S. 67, 81 (1976). "[O]ver no conceivable subject is the legislative power of Congress more complete[.]" *Fiallo* v. *Bell*, 430 U.S. 787, 792 (1977). Though the Executive's discretion over the admission and exclusion of aliens "is not boundless," *Abourezk* v. *Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), there is but a "narrow standard of [judicial] review of decisions made by the

¶ 47 ("Defendants' refusal to reinstate the blanket authority to accept I-130 petitions and/or place an[ ] onsite adjudicator at the [ ] Embassy in Djibouti and/or Malaysia is arbitrary and capricious and rooted in animus towards Yemen[i] nationals.")). In their opposition brief, Plaintiffs similarly argue that the Trump Administration should be required to "return to the policies and practices USCIS and [the] Department of State previously implemented [under the Obama Administration.]" (Pl. Opp. 11). However, Plaintiffs' allegations in the FAC do not directly challenge USCIS's failure to grant blanket authority to the State Department. Instead, the FAC appears to assume that blanket authority presently exists. (*See* FAC ¶ B (urging the Court to "[m]andate that the Defendants[ ] accept and adjudicate the direct filing of Petitioner[s'] I-130 Petition[s] ... at the United States Embassy in Djibouti as is their duty under their blanket authority from USCIS[.]")). Because Plaintiffs' pleadings do not contest the legality of USCIS's failure to extend blanket authority to the State Department, the Court will not construe their pleadings as advancing any such claim. However, because Plaintiffs' opposition brief and Plaintiffs' counsel's declaration challenge the failure to extend blanket authority, the Court here notes that the political question doctrine precludes such a claim, for the same reasons that apply to Plaintiffs' challenge to USCIS's internal staffing decisions. In each instance, there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department[.]" *Baker* v. *Carr*, 369 U.S. 186, 217 (1962). And the "policy choices and value determinations" relating to these decisions have been "constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n* v. *Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

Congress or the President in the area of immigration and naturalization." *Mathews*, 426 U.S. at 82.

Here, Congress has extended broad discretion to USCIS to determine where to establish field offices and where to send its personnel. *See generally* 6 U.S.C. § 271(a)(3). Congress has delegated to USCIS the authority to "establish the policies for performing such functions as are transferred to the Director [of the Bureau of Citizenship and Immigration Services] by this section … or otherwise vested in the Director by law." *Id.* That includes the adjudication of immigrant visa petitions, and the promulgation of policies and procedures regarding same. *Id.* §§ 271(a)(3)(A), 271(b)(1). Those policies, in turn, reinforce USCIS's broad discretion in adjudicating I-130 petitions. *See, e.g.*, INS Policy Memorandum, PM-602-0043.

The discretion afforded to USCIS leaves courts without a "judicially discoverable and manageable standard[ ]" for reviewing USCIS staffing decisions. *Carr*, 369 U.S. at 217. USCIS staffing decisions are based on numerous factors, and the weight accorded each is left to agency discretion. As Defendants explain, "USCIS's international staffing decisions are [made] pursuant to a deliberative process which considers and balances several different factors — the number of immigration applications filed in a given location being only one of those factors." (Def. Br. 14 (citing Nicholson Decl. ¶ 5 ("The decision to allocate USCIS staff at an international location is not based solely on the volume of immigration benefit applications received[.]")).

Defendants identify at least five considerations that USCIS takes into account in its staffing decisions. *First*, USCIS considers its and the Department of Homeland Security's policy priorities. USCIS "starts by identifying the missions and goals within the DHS Quadrennial Homeland Security Review Report ..., including: Preventing Terrorism and Enhancing Security, and Enforcing and Administering Our Immigration Laws." (Nicholson Decl. ¶ 5(a)). *Second*, USCIS considers its workload, including "not only [ ] adjudicative work on immigration applications, but also non-adjudicative work such as providing immigration information services, furthering fraud detection and national security priorities, providing logistical support to the Refugee Affairs Division, and engaging in intra and inter-governmental liaison." (*Id.* at ¶ 5(b)). *Third*, it considers cost, and seeks to identify tasks that could be performed at lesser cost in the United States. (*Id.* at ¶ 5(c)). *Fourth*, it considers whether the quality of work associated with particular tasks might improve if performed within the United States. (*Id.* at ¶ 5(d)). *Finally*, it considers the effect that sending personnel overseas might have on other agencies; and before it sends personnel to a consulate or embassy, it must receive permission from the State Department's Chief of Mission. (*Id.* at ¶ 5(e)).

This Court cannot discern any clear principles or guidelines against which the Court might review USCIS's staffing decisions. Though Plaintiffs allege that those decisions are made on an "as need basis" (FAC ¶ 38), the declarations submitted by USCIS officials in support of the pending motion cite many other factors that inform USCIS's decisions regarding where to send its

personnel, and where to direct petitioners to file their papers. Neither Congress nor any of the Executive agencies has articulated a standard according to which the Court could mandate that USCIS relocate its overseas personnel. The Court agrees with Defendants that "in order to grant the relief sought, the Court would need to … apply the government's competing objectives and priorities in determining where to place staff at its international consulates," and that this is "precisely the discretionary and policy-based … assessment[ ] precluded by the political question doctrine." (Def. Reply 3).

The Court concludes that — even if the claims regarding USCIS staffing decisions were ripe, which they are not — they would not be justiciable under the political question doctrine.

### 2. Plaintiffs' Claims Relating to Consular Officers' Failure to Accept Their I-130 Petitions Fail Under Rule 12(b)(6)

Plaintiffs' remaining claims relate to the failure by consular officers at the Embassy in Djibouti to accept Plaintiffs' direct-filed I-130 petitions. Plaintiffs advance these claims under the APA, the Mandamus Act, and the Declaratory Judgment Act.[8] The Court addresses each statute in turn.

### a. The APA Claim Fails as a Matter of Law

Plaintiffs challenge consular officers' failure to follow their own regulations, which in Plaintiffs' estimation required the consular officers to

---

[8] Though Plaintiffs advance a Fifth Amendment claim, that claim focuses principally not on the consular officers' failure to accept Plaintiffs' I-130 petitions, but rather on Defendants' refusal to staff the Embassies in Djibouti and Malaysia with USCIS adjudicators. (*See* FAC ¶¶ 95-96). Because the Court has already found that all claims relating to USCIS staffing decisions are unripe and non-justiciable, the Court does not proceed to a Rule 12(b)(6) analysis for Plaintiffs' Fifth Amendment claim.

accept Plaintiffs' direct-filed I-130 petitions. It is well settled that "an administrative agency must adhere to its own regulations," *see Singh* v. *U.S. Dep't of Justice*, 461 F.3d 290, 296 (2d Cir. 2006), and that parties may bring claims under the APA where agencies fail to take discrete actions that are required of them, *see People for the Ethical Treatment of Animals* v. *U.S. Dep't of Agric.*, 797 F.3d 1087, 1098 (D.C. Cir. 2015) (a claim can proceed "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*" (quoting *Norton* v. *S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004))).

The APA exempts from judicial review agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This narrow exception to reviewability of agency actions applies when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler* v. *Chaney*, 470 U.S. 821, 830 (1985). Put differently, judicial review is unavailable where there is no "judicially manageable standard[ ]" by which to judge the agency's action. *Id.*

Here, the relevant statutory provisions and regulations did not, as Plaintiffs assert, require Defendants to permit Plaintiffs to file their I-130 petitions directly with the Embassy in Djibouti. To begin with, the INA — the statute that Plaintiffs claim Defendants failed to enforce (FAC ¶¶ 67, 83) — does not provide any substantive standards relevant to the questions at issue here: whether petitioners must be permitted to file their I-130 petitions in their countries of residence, rather than being directed to file their petitions via the

32

Chicago lockbox.  To be sure, the statute establishes that "any citizen of the United States claiming that an alien is entitled to classification by reason of a [familial] relationship … may file a petition with the Attorney General for such classification."  8 U.S.C. § 1154(a)(1)(A)(i).[9]  But it is silent as to the filing procedures to which petitioners are entitled; nothing in the statute suggests that Plaintiffs have the right to file their petitions at the Embassy in Djibouti.  The same is true of 8 C.F.R. § 204.1 ("CFR"), which governs immigrant visa petitions.  In a section entitled, "Proper filing," it states simply that a petition "must be filed on the form prescribed by USCIS in accordance with the form instructions[.]"  *Id.* § 204.1(b).  It does not limit USCIS's discretion in denying Plaintiffs permission to file their petitions directly at the Embassy in Djibouti.

Plaintiffs rely primarily on language in a USCIS policy memorandum regarding the State Department's Foreign Affairs Manual, which memorandum states, in relevant part, that "[i]f a consular officer in an embassy or consulate where USCIS is not present encounters an individual case that the officer believes requires immediate processing due to exceptional circumstances, the consular officer should contact the USCIS Field Office Director … to determine whether [the State Department] may accept and adjudicate the case."  INS Policy Memorandum, PM-602-0043.  Yet the memorandum does not require consular officers to accept direct-filed I-130 petitions, nor does it compel USCIS to send adjudicators overseas to ensure that petitioners may file their petitions

---

[9]     The Homeland Security Act of 2002 transferred authority to adjudicate I-130 petitions to USCIS.  6 U.S.C. § 271(b).

locally. Instead, like the INA and the relevant provisions in the CFR, the memorandum commits those decisions to agency discretion. It makes plain that the State Department has no authority to permit an Embassy or Consulate to accept the filing of a Form I-130. *Id.* Instead, USCIS "*will have discretion* to determine which cases may be processed by [the State Department] and which cases must be filed by mail with the USCIS lockbox in the United States." *Id.* (emphasis added). The USCIS Field Office Director "with jurisdiction over [the relevant] location … will determine whether [the State Department] may accept and adjudicate the case." *Id.* Though the memorandum explains that Field Office Directors "have the discretion to authorize a [State Department] adjudication of an I-130 [petition] when there are compelling humanitarian reasons to do so," and provides examples of exceptional circumstances when USCIS "will likely" authorize direct filing, it provides Field Office Directors with broad discretion in determining whether to permit direct-filed I-130 petitions. *Id.*

Plaintiffs have not cited any statute, regulation, memorandum, or other authority that either directly empowers or requires consular officers to accept I-130 petitions, or requires USCIS to delegate that authority to consular officers. Nor have Plaintiffs identified any statute that "limit[s] agency discretion by furnishing 'law to apply' under the APA." *Lunney* v. *U.S.*, 319 F.3d 550, 559 (2d Cir. 2003) (citing *Lincoln* v. *Vigil*, 508 U.S. 182, 193-95 (1993)). The Court therefore grants Defendants' Rule 12(b)(6) motion to dismiss Plaintiffs' APA claim.

### b.    The Mandamus Act Claim Fails

Pursuant to 28 U.S.C. § 1361, Plaintiffs seek to compel Defendants "to discharge their statutory duties ... so that [Plaintiffs] may be promptly informed of the outcome of their Immigrant Visa applications by scheduling interviews." (FAC ¶ 77).  The Mandamus Act provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  "The action that the plaintiff seeks to compel must be subject to positive command, plainly described, and free from doubt."  *Keane* v. *Chertoff*, 419 F. Supp. 2d 597, 599 (S.D.N.Y. 2006) (internal quotation marks and citation omitted).  To obtain relief, a plaintiff must show that "[i] there is a clear right to the relief sought; [ii] the Government has a plainly defined and peremptory duty to perform the act in question; and [iii] there is no other adequate remedy available."  *Benzman* v. *Whitman*, 523 F.3d 119, 133 (2d Cir. 2008).

Plaintiffs have not established that Defendants have any duty, much less one that is "plainly defined and peremptory," to accept Plaintiffs' I-130 petitions at the Embassy in Djibouti rather than via the Chicago lockbox.  Nor have they established a "clear right" to the relief sought.  Instead, USCIS, in its discretion, may require Plaintiffs to follow the default procedures by filing their petitions via the Chicago lockbox.  Plaintiffs have also failed to establish that they lack an alternative remedy.  As discussed above, Plaintiffs' suggestion that filing their petitions via the lockbox would be futile is speculative.  Indeed, that

claim rests on Plaintiffs' view that they would inevitably be required to travel to the United States for in-person interviews, a view that Plaintiffs have failed to substantiate and that contradicts existing agency regulations. For these reasons, Plaintiffs' claim under the Mandamus Act fails as a matter of law.

### c.     The Court Will Not Issue a Declaratory Judgment

Finally, Plaintiffs bring a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, requesting that the Court issue a declaration that "the Defendants[ ] have severally and jointly failed to discharge their mandated official duties." (FAC ¶ 91). While the Declaratory Judgment Act provides an additional "remedial arrow in the district court's quiver," *Wilton* v. *Seven Falls Co.*, 515 U.S. 277, 288 (1995), it is not a "source of substantive rights," *Dow Jones & Co.* v. *Harrods, Ltd.*, 237 F. Supp. 2d 394, 431 (S.D.N.Y. 2002). Nor does the statute impose any duty upon the courts to grant this remedy.

As the Court has explained in the preceding sections, Plaintiffs have not provided any sound basis on which the Court might issue the requested declaration. Accordingly, Plaintiffs' claim under the Declaratory Judgment Act fails.

### CONCLUSION

For the reasons set forth above, Plaintiffs' claims are DISMISSED. In dismissing these claims, the Court does not fail to appreciate the hardships that Plaintiffs have faced, and continue to face, as a result of the ongoing civil war in Yemen and the circumstances of their continued residence in Djibouti. However, because Plaintiffs' claims relating to USCIS staffing decisions are

unripe and non-justiciable, and because Plaintiffs' pleadings regarding consular officers' failure to accept direct-filed I-130 petitions fail to state a valid claim for relief, the Court must grant Defendants' motion to dismiss.

The Clerk of Court is directed to terminate all pending motions, adjourn any remaining dates, and close this case.

SO ORDERED.

Dated:     August 31, 2018
           New York, New York

_____
        KATHERINE POLK FAILLA
      United States District Judge